**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 07a0372n.06**
**Filed: May 31, 2007**

**No. 06-5813**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MARTINO TAYLOR, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| UNITED PARCEL SERVICE, INC, | ) | WESTERN DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellee. | ) | |

Before: SUHRHEINRICH, CLAY and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Martino Taylor filed this action against his employer, United Parcel Service, Inc. (UPS), for retaliation and race discrimination in violation of Title VII, § 1981 and Tennessee law. The district court granted summary judgment in favor of the company, and we affirm.

I.

Taylor began working for UPS in 1994. He held various part-time jobs with the company until 2001, when he obtained a full-time "combination" position in UPS's Oakhaven facility in Memphis, Tennessee. In accordance with the terms of the collective bargaining agreement that governed Taylor's employment, combination positions join two part-time jobs, making them one

full-time position. Taylor's position was classified as "inside/inside" because he performed all of his work—both part-time jobs, in other words—within the Oakhaven facility.

Article 41 of the collective bargaining agreement generally describes the pay scale for full-time employees. It establishes a "progression" for wage increases, with employees hitting the top pay rate after about two years. JA 543–44. Taylor completed this progression in August 2003, earning the then-top rate of $19.00 per hour.

In October 2003, UPS posted an opening for a combination air/inside job—a position that split duties between delivering air packages and performing work inside the Oakhaven facility. In bold, underlined language, the posting explained that the "rate of pay for this particular job is governed by Article 40." JA 93. In contrast to Article 41, Article 40 covers UPS's air operation and says that combination air/inside employees will be "paid the appropriate full-time air rate for air driver work and appropriate inside part-time rate for the hours worked in other classifications." JA 542.

Taylor successfully bid for the air/inside position. Soon after starting the new job, he asked supervisors Ken Billings and Vickie Wiseman about performing the air portion of the position. They responded that "there wasn't [any such] work available" and asked Taylor, as a result, to perform just inside work. JA 255. Another supervisor, Tony Smith, noted that the company did not train Taylor to deliver air mail in November and December because it was so "busy" during the holiday season. JA 95.

Not only did Taylor perform just inside work in the new job, but he also soon noticed that the company was paying him about three dollars less per hour than it had paid him before the switch. In December, he filed a grievance under the collective bargaining agreement complaining about his new pay rate. By that time, it turns out, he had no problem doing only inside work; he just wanted to be paid as much he had been paid under his prior classification. A grievance panel could not resolve the dispute, so the case was forwarded to a deadlock committee, consisting of one representative from Taylor's union and one UPS representative. In February 2004, the deadlock committee denied his grievance, with both members agreeing that the company should pay him a part-time pay rate for inside work because his job was classified as air/inside.

Taylor's position remained classified as air/inside until July 2005, when the union demanded it be reclassified as inside/inside to reflect the actual duties of the position. As required by the collective bargaining agreement, UPS re-bid the position as inside/inside and awarded it to Taylor after a bidder with more seniority turned it down.

Taylor filed a complaint against UPS in district court alleging race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981 and the Tennessee Human Rights Act, *see* Tenn. Code Ann. § 4-21-101 *et seq*. In May 2006, the district court granted UPS's motion for summary judgment.

II.

On appeal, Taylor maintains (1) that UPS reduced his pay in retaliation for an earlier grievance he filed against the company and (2) that the company refused to train him to deliver air packages because he is African-American. A common framework governs retaliation and race discrimination claims filed under Title VII, § 1981 and the Tennessee Human Rights Act. *See Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001). Because Taylor bases his claims on circumstantial (rather than direct) evidence, we apply the *McDonnell Douglas* burden-shifting requirements. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987). Under that decision, Taylor must establish a prima facie case of discrimination; UPS may rebut the presumption of discrimination arising from this prima facie showing by articulating a legitimate, nondiscriminatory reason for its action; and, if UPS supplies such a reason, Taylor must show that it is pretextual. *See McDonnell Douglas*, 411 U.S. at 802–05; *see also Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) ("To make a submissible case on the credibility of his employer's explanation, the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.") (internal quotation marks and emphases omitted).

A.

Taylor bases his retaliation claim on the allegation that UPS cut his pay in response to an employee grievance he filed in May 2003. The grievance accused "white managers" T.J. Harper (of the human resources department) and Walt Dickson (of the labor department) of "harass[ing Taylor] and discriminat[ing] against" him by "making their own rules of the contract" rather than following the collective bargaining agreement. JA 468. A panel consisting of an equal number of UPS and union representatives denied Taylor's grievance.

On the record before us, it is by no means clear that Taylor satisfies the "causal connection" element of a prima facie case of retaliation. *See Wrenn*, 808 F.2d at 500. Even assuming that he has satisfied this threshold requirement, however, he has not created a triable issue of fact regarding the legitimacy of the non-discriminatory reason UPS offered for reducing Taylor's pay.

According to UPS, it reduced Taylor's pay when he switched from the inside/inside job to the air/inside job because the collective bargaining agreement required it to do so. Before he obtained the job, Taylor earned the top full-time inside rate of $19.00 per hour in accordance with Article 41 of the collective bargaining agreement. UPS's posting of the air/inside position indicated that Article 40 governed the pay for it. Taylor voluntarily applied for the position, thinking "that it was better" than what he had been doing "[b]ecause it's a driving position, not . . . a labor position." JA 253. Before taking the job, however, Taylor did not ask UPS whether it would affect his pay.

Consistent with UPS's explanation, Article 40 says that the company must pay air/inside employees the "appropriate inside *part-time* rate for the hours worked in [non-air] classifications." JA 542 (emphasis added). In accordance with this provision, Taylor received a part-time inside rate for the inside work that he performed. The payroll department initially calculated this rate at $16.85 per hour; Dickson later pointed out that Taylor's appropriate part-time rate was $15.85 per hour (a point Taylor does not dispute), and the payroll department so reduced his pay.

Further justifying UPS's position is the outcome of the grievance that Taylor filed over his reduced pay. *See Jasany v. U.S. Postal Serv.*, 755 F.2d 1244, 1252 (6th Cir. 1985) (observing that "the result of the [grievance] procedure is evidence that the employer's action was or was not justified") (emphasis omitted). Both UPS and the union agreed that the collective bargaining agreement—specifically Article 40—required the company to lower Taylor's pay when he voluntarily applied for, and accepted, the air/inside position, which held a different pay classification from the inside/inside position. That the air duties affiliated with the position never materialized does not change matters. As the grievance procedure confirmed, his job classification continued to be governed by Article 40 and the pay rate established by that provision.

Nor, it bears adding, was Taylor without recourse had he wished to make sure that his job classification reflected the work he was actually doing. Consistent with the collective bargaining agreement, he could have asked the company to reclassify his position as an inside/inside job to reflect the nature of his responsibilities. JA 156, 570. Had he made such a request, however, it would have opened up the possibility of a more-senior employee winning the position—which

perhaps explains Taylor's reticence in requesting a re-classification. *See* JA 564 ("When a . . . new job becomes open the employer shall post it for bid . . . ."). Taylor also rebuffed the company's later offer to train him to deliver air packages (and bring his job's duties in line with its classification) because he was "comfortable doing . . . the inside/inside" work. JA 290.

Attempting to show that UPS's explanations for his rate of pay were pretextual, Taylor first points to deposition testimony of Cedric Williams, a UPS labor manager. According to Williams, Taylor should have been "getting whatever pay rate is applied to the inside part of [his] job . . . if he [didn't] do air." JA 152. But this is precisely what happened: Because Taylor did not perform air work, the company paid him at the lower part-time inside rate for all of the hours he worked, as required by Article 40.

Taylor next says that the collective bargaining agreement "goes out of its way to [e]nsure that an employee's pay is not reduced as a result of a job transfer," Br. at 31, invoking this provision in Article 41: "No employee shall be required to complete a full-time progression more than one (1) time even if he or she transfers between full-time jobs." JA 543. But UPS did not make him begin his full-time progression anew; the company instead returned him to the part-time pay scale under Article 40—as the job posting indicated would happen.

Also unconvincing is Taylor's reliance on other provisions of the collective bargaining agreement. They address situations in which a part-time employee transfers to a full-time position, and the top pay rate for the full-time position is less than the rate the employee earned in his part-

time job. When this happens, "the employee shall be placed at the top rate of the new classification immediately." JA 543. Here, however, Taylor transferred from a full-time position to another full-time position. Far from ensuring "that an employee's pay is not reduced as a result of a job transfer," Br. at 31, these provisions recognize that UPS may pay employees at a lower rate than that they had previously earned, JA 543.

### B.

Taylor's claim that UPS refused to train him to deliver air mail on account of his race fails at the prima facie stage, because he has not shown that any "similarly situated, non-protected employees were treated more favorably" than he was. *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002). On appeal, he argues that the company trained Steve West (a less-senior white employee) at the same time it relegated Taylor to inside work. Br. at 27. But the evidence does not support this assertion. In his deposition Taylor claimed that UPS allowed West to deliver air mail, not that UPS trained him to do so. Even if we take Taylor to argue that merely allowing West to drive was discriminatory, he has not shown that West was similarly situated "in all of the *relevant* aspects," *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks omitted), and makes no effort to do so beyond a "bald assertion" to the contrary, D. Ct. Op. at 8.

Taylor next invokes *Ercegovich* for the proposition that he may satisfy his prima facie burden by identifying "a similarly-situated employee . . . *or* [by presenting] other direct, indirect, or

circumstantial evidence supporting an inference of discrimination." 154 F.3d at 351 (emphasis added). But *Ercegovich* addressed an employer's failure to transfer (rather than lay off) an employee during a reduction-in-force. *Id*. In that setting, we have altered the claimant's prima facie burden "to require the plaintiff to show that the employer singled her out for discharge for impermissible reasons, as the employee is not 'replaced' after a RIF." *Smith v. Allstate Ins. Co.*, 195 F. App'x 389, 394 (6th Cir. Aug. 16, 2006). *Taylor* has not identified a non-reduction-in-force case formulating the test in this manner. *See, e.g.*, *Clayton*, 281 F.3d at 610 (To make a prima facie showing of race discrimination, a plaintiff must "prove that he was either replaced by a person outside of the protected class or show that similarly situated, non-protected employees were treated more favorably.").

At any rate, even if we allowed Taylor to proceed upon showing "direct, indirect, or circumstantial evidence supporting an inference of discrimination," he has failed to do so. No discriminatory inference arises from UPS allowing West to drive without knowing more about West (for instance, whether he needed to be trained before beginning to deliver packages). Similarly, Taylor's assertion that supervisors delivered packages, allegedly in violation of the collective bargaining agreement, does not support an allegation of race discrimination in light of his deposition testimony that it was commonplace for supervisors to perform such duties. *See* JA 257 ("[S]upervisors working . . . is to me like a daily thing.").

Taylor finally argues that UPS's failure to identify any other employees who moved from an Article 41 position to an Article 40 position and subsequently had their pay rate decreased for inside

work shows discrimination. Although he does not spell it out, the inference he is suggesting must be that his supervisors knew that Taylor received a lower rate for air work than inside work and, because of his race, forced him to do solely inside work so that he would be paid less. But there is no evidence that Harper and Dickson, the managers he accuses of retaliation, played any role in his day-to-day work assignments. Nor is there evidence that the supervisors who declined to train Taylor knew that he would receive less pay if kept inside. *See Woythol v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) ("[M]ere personal belief, conjecture and speculation are insufficient to support an inference of . . . discrimination.") (internal quotation marks omitted).

## C.

Given our dismissal of these claims as a matter of law, we need not address Taylor's final claim—that the district court should have permitted him not only to amend his complaint but also should have permitted him to change his mind about seeking a jury trial.

## III.

For these reasons, we affirm.