**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0147n.06
Filed: March 14, 2008

**NO. 07-1353**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MARTICE BERRY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | APPEAL FROM THE DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| CITY OF PONTIAC, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

**BEFORE: DAUGHTREY and SUTTON, Circuit Judges; and POLSTER, District Judge.**[*]

**Dan Aaron Polster, District Judge.** Martice Berry, an African-American male, appeals the

district court's decision to grant summary judgment in favor of the City of Pontiac on Berry's claims

that the City disciplined and terminated him from his position as a police officer based on his race.

For the following reasons, we affirm.

**I.**

Martice Berry began working as a police officer for the City of Pontiac Police Department

in May 2002. The terms and conditions of his employment were governed by a collective bargaining

agreement negotiated between the City and the Pontiac Police Officers Association (the "Union"),

and by the rules, regulations and procedures detailed in the Pontiac Police Department's Manual of

---

[*]The Honorable Dan Aaron Polster, United States District Judge for the Northern District
of Ohio, sitting by designation.

Conduct and Procedures (the "Police Manual").

Pursuant to the terms of the collective bargaining agreement, before an officer was charged with a violation of the City's rules and regulations, the Police Department's Professional Standards Division (sometimes referred to as internal affairs) would conduct an internal investigation into the officer's alleged conduct. The officer would be notified of the charges, afforded Union representation and entitled to respond to the allegations. If the investigation resulted in sustained charges against the officer, it would be documented in the form of a Professional Conduct Report ("PCR") indicating the rule(s) violated and the level of discipline meted out to the officer. PCRs remained active in an officer's employment file for a period of three years from the date of issuance. Citizen complaints were treated in much the same manner.

The City practiced a system of progressive discipline, although neither the collective bargaining agreement nor the Police Manual so required. Discipline ranged from coaching to counseling to suspension and termination. The appropriate discipline was based on considerations of prior disciplinary history along with the severity of the charged conduct – although particularly severe conduct would receive more severe discipline, regardless of the officer's stage of progressive discipline.

In late November 2004, Juanita Carattini and Antawian Ball each filed citizen complaints against Officer Berry alleging that he was using his authority as a police officer to harass them both on and off duty. Mr. Ball was the boyfriend of Ms. Carattini, a woman who had formerly had a relationship with Officer Berry. Ms. Carattini had also dated Mr. Ball, with whom she had two children, prior to dating Officer Berry. At the time the citizen complaints were filed, Officer Berry had accumulated seven disciplinary actions for Police Manual violations within the previous eighteen

2

months: one coaching, two documented counselings, two written reprimands and two 10-hour suspensions.[1]

The Department assigned Lieutenant Charles Herring, an African American, to conduct an internal affairs investigation into the citizen complaints. On December 13, 2004, Berry raised his voice and allegedly pointed his finger into Lt. Herring's face, in the presence of other officers, while being interviewed by Lt. Herring. Based on this insubordination, Lt. Herring wrote Berry up for a violation of §§ 3.01 (Assaultive and Abusive Language) and 1.01 (Responsibility of Member) of the Police Manual, for which Berry received a 160-hour suspension.

As his investigation progressed, Lt. Herring unearthed numerous violations of the Police Manual by Officer Berry. Ms. Carattini informed Lt. Herring that, while she and Officer Berry were dating, Officer Berry vowed to "get" Mr. Ball. The evidence corroborates this allegation. Officer Berry ran at least four checks of Ball on the Law Enforcement Information Network ("LEIN"), unrelated to any official business, during Berry's relationship with Carattini. The evidence also

_____

[1]The evidence shows that Berry's personnel file at that time contained the following documented disciplinary actions:

June 21, 2003. Berry behaved in a discourteous manner and violated his responsibility as an officer, resulting in a written reprimand.

September 13, 2003. Berry was alleged to have engaged in physical abuse or assault. The investigation did not sustain this charge, but uncovered that Berry had behaved in a discourteous manner. He was coached to improve his conduct.

September 20, 2003. Berry was found guilty of absenteeism and received documented counseling.

November 19, 2003. Berry violated the Department's records policy and its policy on his responsibilities as an officer, resulting in a 10-hour suspension.

February 1, 2004. Berry's capability and performance were found unsatisfactory, resulting in a second written reprimand.

April 1, 2004. Berry violated the Department's policy on conduct and courtesy and its policy on treatment of individuals in custody, resulting in a second 10-hour suspension.

Berry does not dispute the accuracy of these infractions nor does he argue that they were based on a racially discriminatory motive.

3

shows that, contrary to the provision of the Police Manual permitting an officer to arrange for bond only for family members or persons specifically authorized by the Police Chief, Officer Berry had paid Ms. Carattini's bond when she was arrested in another jurisdiction. Ms. Carattini informed Lt. Herring that, while dating Officer Berry, he had told her that he would take care of a traffic violation she received in another jurisdiction, and then assured her the matter had been resolved after running LEIN checks. The evidence shows that, in fact, he knew the matter had not been resolved and, after they stopped dating, used the resulting suspension of her license as a premise to stop her and issue her a traffic citation. He also used this traffic stop as an opportunity to obtain her current address for purposes of a civil lawsuit he had brought against her to recover money he allegedly loaned her during their relationship. According to Ms. Carattini, Officer Berry filed the civil suit against her only after he discovered that she was again dating Ball. Finally, the evidence shows that Officer Berry ran at least four unauthorized LEIN checks on Ms. Carattini after their relationship ended.

The investigation revealed that, on November 21, 2004, Berry and his partner, Officer James Wilkins, conducted a traffic stop of Ball and called for backup assistance to do so. As they were executing the stop, police dispatch sent out a call for assistance with a felony robbery. The dispatcher advised that a pizza restaurant in the area had just been robbed and the manager was chasing the suspects on foot. The officers assisting Berry and Wilkins immediately left the traffic stop and responded to the robbery call. Berry and Wilkins remained with the traffic stop for fifteen more minutes while dispatch confirmed Ball's driving status. They cited Ball for, among other things, speeding – even though Berry was caught on his vehicle's audio/video recorder stating that he knew he was too far away to determine if Ball had been speeding. When the traffic stop was over, Berry and Wilkins responded to the robbery dispatch. The Professional Standards Division faulted

4

Berry and Wilkins for failing to respond to the robbery immediately. (They could have given Ball a warning.) It also found that Berry's explanation of why he chose not to respond to the robbery incredible, given that he had just asked backup for a routine traffic stop.

The investigation also revealed that Officer Berry violated the Police Manual by accepting a $200 per month discount in his rent to act as a "courtesy officer" for his apartment complex without submitting a written request for off-duty employment to the Chief of Police, whose approval is required prior to accepting such employment.

Based on these findings, the Professional Standards Division determined that Officer Berry had committed a total of thirteen Police Manual violations: one Responsibility of Member violation, one Neglect of Duty violation, seven instances of Conduct Unbecoming an Officer, two Abuse of Position violations, one Bail provision violation and a violation of the Truthfulness provision for being generally deceptive and untruthful during the course of the investigation. Based on these infractions and given Berry's prior disciplinary history, the Department decided to terminate his employment effective March 21, 2005.

Officer Berry grieved the termination of his employment and, on October 31, 2006, the arbitrator issued a decision awarding Berry his job with back pay. The arbitrator found that there may be just cause to fire Officer Berry, but the City's failure to follow the procedures in the collective bargaining agreement required his reinstatement.

On January 17, 2006, Berry sued the City, alleging that his 160-hour suspension and his termination constituted race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. On February 12, 2007, following the close of discovery, briefing of the City's summary judgment motion and oral argument, the district court

granted summary judgment for the City. In doing so, the district court found that Berry failed to establish a *prima facie* case of racial discrimination in either his suspension or termination because he could not show that he was treated different than similarly situated, nonprotected officers.

## II.

We review a district court's grant of summary judgment de novo. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must review all the evidence and draw all reasonable inferences in favor of the nonmovant. *Matsushito Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Johnson*, 398 F.3d at 873. The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

## III.

On appeal, Officer Berry argues that his 160-hour suspension was race-based because two similarly situated Caucasian officers accused of committing similar infractions received a lesser discipline. He argues that he was unlawfully terminated based on his race because his Caucasian partner, ostensibly guilty of the same infractions, was neither terminated nor disciplined for the same violations. Finally, he argues that the City's articulated reasons for terminating his employment were pretextual.

A common framework governs race discrimination claims under Title VII and 42 U.S.C.

6

§ 1981. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004). Because Officer Berry bases his claims on circumstantial evidence, we apply the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Taylor v. United Parcel Serv.*, 237 Fed. Appx. 34, 36 (6th Cir. 2007) (citing *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)). To establish a *prima facie* case of discrimination, Officer Berry must show that (1) he is a member of a protected class; (2) he was qualified for the position from which he was fired; (3) he was subject to an adverse employment action; and (4) he was treated differently than employees outside the protected class for same or similar conduct. *See McDonnell Douglas*, 411 U.S. at 802. If Officer Berry can establish a *prima facie* case of discrimination, the City may rebut the presumption of discrimination that arises by articulating a legitimate, nondiscriminatory reason for its action; and, if the City so articulates such a reason, Berry must show that it is pretextual. *Id.*; *see also Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

## A.

Officer Berry has failed to establish a *prima facie* claim that his 160-hour suspension was unlawfully based on his race because he cannot show that any similarly situated, nonprotected employees engaged in the same conduct as he did and were treated better. *Mitchell v. Toledo Hosp.*, 964 F.2d 557, 582-83 (6th Cir. 1992); *Majewski v. Automatic Data Processing*, 274 F.3d 1106, 1116 (6th Cir. 2001). For Berry to compare his discipline to that of nonminority employees, he must show that his comparables are similarly situated to him in all relevant respects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Generally, in cases alleging disparate disciplinary action, the plaintiff must show that the alleged comparables dealt with the same

7

supervisor, were subject to the same standards and engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quoting *Mitchell*, 964 F.3d at 583)). The plaintiff need not, however, demonstrate "an exact correlation" with the employee alleged to have received more favorable treatment in order for the two to be considered similarly situated. *Id.* (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).

The two nonprotected officers to whom Berry has compared himself are Officer Miller Dao and Officer Steven Wittebort. With respect to Officer Dao, Berry argues that he also was accused of conduct unbecoming an officer and untruthfulness; yet, the City only assessed Dao a 20-hour suspension without pay. The evidence shows that, on March 19, 2005 (after Berry was terminated), Dao violated Police Manual §§ 1.02 (Responsibility of a Member), 4.01 (Departmental Records), 17.01 (Conduct Unbecoming an Officer) and 17.03 (Truthfulness) when he incorrectly filled out a police report, resulting in a 20-hour suspension. At the time of these infractions, the Department had only disciplined Dao four times, resulting in two documented counselings, one written reprimand and one 10-hour suspension. When the City issued Berry the 160-hour suspension, he had already violated the Manual on seven different occasions, resulting in one coaching, two documented counselings, two written reprimands and two 10-hour suspensions. Thus, just based on the numbers and the Department's practice of progressive discipline, Officer Berry cannot show that Dao was similarly situated. Nor can Officer Berry show that Dao engaged in conduct of the same nature or severity when he received a lesser suspension. Dao received his 20-hour suspension for incorrectly filling out a police report while Berry received his 160-hour suspension for insubordination to a superior officer in the presence of other officers while the superior officer was conducting an internal

8

affairs investigation into his alleged harassment of citizens. Finally, Officer Berry cannot show that he and Dao were similarly situated because, although Police Chief Gackstetter ultimately approved their discipline, such approval was based upon the recommendations of two different supervising officers (Lt. Herring recommended Officer Berry's suspension, and Sgt. Kathleen Mickens recommended Officer Dao's suspension). *See Ercegovich*, 154 F.3d at 352 (citing *Mitchell*, 964 F.2d at 583); *cf. Shager v. Upjohn Co.*, 913 F.2d 398, 406 (7th Cir. 1990) (supervisor providing information to ultimate decision-maker can effectively influence and control that person's decision); *but see McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) (the requirement that a plaintiff and his comparable must have dealt with the same supervisor to be similarly situated does not automatically apply in every case).

Officer Berry also cannot show that Officer Wittebort is similarly situated. In January 2006, Wittebort violated Police Department Manual §§ 1.02 (Responsibility of a Member), 3.03 (Assaultive and Abusive Language) and 8.01 (Conduct and Courtesy) when he swore at Sergeant Jeffery Smith and questioned the reasoning behind Smith's order, resulting in an 80-hour suspension. In marked contrast to Berry, Wittebort had only one documented counseling, one written reprimand and no suspensions on his record at the time of this disciplinary action – and the discipline was reported by a different supervisor and approved by a different Police Chief (Valard Gross).

With respect to the termination, Berry contends that he was treated less favorably than his Caucasian partner, Officer Wilkins, whom, he argues, engaged in the same conduct. While Officer Berry is correct that Wilkins violated some of the same Manual provisions as Berry (e.g., delayed response to a robbery in progress and obtaining a discount in rent for being a courtesy officer at the apartment complex without prior approval), those instances are far less in number than the numerous

9

infractions that led to Berry's termination. Moreover, Berry's infractions are different in character from Wilkins' alleged infractions. There is no evidence that Wilkins delayed his response to the robbery to harass Ball, but because he was helping his partner execute what he thought was a legitimate traffic stop. Indeed, Officer Berry admitted at deposition that he was unaware of any protected or nonprotected officer who was charged with the number and character of infractions he had amassed who was not terminated.[2]

Rather, the evidence shows that Officer Berry was terminated as the result of an internal affairs investigation that uncovered numerous, egregious instances of Berry's abuse of power. He ran numerous LEIN checks on Ball unrelated to any official business, while he was dating Carattini – then ran numerous unauthorized LEIN checks on Carattini after their relationship ended.[3] He abused his authority by conducting traffic stops of Ball and Carattini for personal motives; and he jeopardized the safety of officers and citizens while conducting one of those stops. He was deceitful during the course of the internal affairs investigation, and was downright surly toward Lt. Herring.

Because Officer Berry has failed to identify a nonprotected officer who engaged in the same conduct but was not terminated, we need not address his argument that the reasons for his termination were only a pretext for intentional racial discrimination. Accordingly, we **AFFIRM**.

---

[2]We also note that, prior to November 2004, Police Chief Gackstetter, a Caucasian, had concurred in findings that at least two citizen complaints against Officer Berry were unfounded. And Lt. Herring, who was also responsible for investigating prior citizen complaints against Officer Berry, determined that they were unfounded and recommended no disciplinary action.

[3]Berry's argument that he did not misuse the LEIN system because the Oakland County Prosecutor decided not to criminally prosecute him for that offense does not absolve him of violating the Pontiac Police Department's LEIN policy. Berry had no legitimate law enforcement objective, and he accessed the system improperly to further his personal interests and to harass two citizens.

10