<u>NOT RECOMMENDED FOR PUBLICATION</u>
File Name: 18a0459n.06

**No. 17-1411**

**UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>RAMONA DEBRA</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>    Plaintiff-Appellant,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>ON APPEAL FROM THE</td></tr>
<tr><td></td><td>)</td><td>UNITED STATES DISTRICT</td></tr>
<tr><td>JPMORGAN CHASE & COMPANY</td><td>)</td><td>COURT FOR THE  WESTERN</td></tr>
<tr><td></td><td>)</td><td>DISTRICT OF MICHIGAN</td></tr>
<tr><td>    Defendant-Appellee.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

**FILED**
Sep 05, 2018
DEBORAH S. HUNT, Clerk

**BEFORE:**  **MOORE, GIBBONS, and ROGERS, Circuit Judges.**

**JULIA SMITH GIBBONS, Circuit Judge.**  In this appeal, we are asked to determine whether Ramona DeBra's age discrimination case should survive summary judgment and go before a jury.  The ultimate issue is whether DeBra has presented sufficient evidence to demonstrate that the legitimate non-discriminatory reason offered by her employer JPMorgan Chase & Company ("Chase") for her termination was in fact pretext for age discrimination.  Because she has failed to do so, we affirm the district court's grant of summary judgment.

I.

A.

DeBra began working as a part-time teller for Chase[1] in 1996 and remained a teller throughout her employment with the bank.  As a teller, her duties included handling cash properly,

---

[1] Technically, DeBra started at NBD Bank, which later became JPMorgan Chase after a succession of mergers and acquisitions.

processing transactions accurately, and providing good customer service. Although she started at the bank's Northland Drive branch, DeBra was transferred to the Ada branch in 2009, and by 2013, she was splitting her 32-hour work week between Chase's Ada branch and its Plainfield branch. Kyle Clements became the branch manager of Ada in 2012, and Kevin Sexton became first the interim and then the permanent branch manager of Plainfield in 2013. In 2014, once DeBra began spending twenty of her thirty-two hours at Plainfield, Sexton became her primary manager.

DeBra was not subject to formal disciplinary action until 2014. However, two of her pre-2014 performance reviews reveal that her supervisors had singled out her cash handling abilities as areas for improvement. In her 2007 performance review, DeBra was given an overall "meets expectations" rating but a "needs improvement" rating for her transaction accuracy. In her 2012 mid-year review, DeBra also received an overall rating of "low meets expectations," and the "areas for improvement" section contained the admonition that "Ramona needs to remain focused at all times to detail and accuracy. Immediate attention to bank assets is a must." DE 40-5, 2012 Mid-Year Report, Page ID 188.

Moreover, notes taken by Clements in 2012 and 2013 reveal that DeBra made numerous cash handling and cash control errors, including depositing funds into the wrong person's account, ATM-balancing errors, leaving $100 cash in a drawer, and failing to correctly reverse a transaction, leading to a $700 shortage. The notes also demonstrate that DeBra was asked to improve her overall attitude and customer service abilities; for instance, Clements wrote on May 22, 2012 that DeBra was "[w]orking on nails and [left] nail clippings in window," and twice documented instances where DeBra was not sufficiently "attentive" to customers. DE 43-5, Clements's Notes, Page ID 436. Despite these errors, DeBra continued to receive passable performance reviews and did not face any formal disciplinary action.

DeBra's situation changed, however, when Sexton took over as manager of the Plainfield branch. In her affidavit, DeBra claims that shortly after Sexton became the interim branch manager in December 2013, he told DeBra "that he didn't want to get close to a person, because it would be more difficult to fire that person." DE 43-2, DeBra Affidavit, Page ID 403. DeBra believed that the statement was "directed at me, and it revealed that he was already planning to fire me." *Id.* Sexton denied making the statement.

"Cash controls" refer to the various procedures Chase uses to ensure that a branch is correctly securing cash, depositing cash into customer's accounts, and running transactions. Such procedures include securing cash lockers, coin vaults, and teller drawers; being careful not to leave cash exposed; and counting cash three times when conducting a transaction. Clements testified that cash controls are "vital to [Chase's] business." DE 40-8, Clements Dep., Page ID 202. Almost immediately after he became branch manager, Sexton began documenting cash control errors made by DeBra. He documented twelve cash handling and cash control errors that spanned December 2013 through March 2014. He could not recall making similar notes for other employees at the branch. Some of DeBra's errors were minor—leaving $5.00 in the cash counter on one instance and failing to unjam a $10.00 bill from the counter on another instance. Some were more significant, such as failing to return a debit card to a customer at the drive-through window or failing to recover $194.77 that had erroneously been paid to a client.

In December 2013, Sexton contacted Clements about DeBra's performance issues. Sexton testified that he wanted to find out whether DeBra's cash handling mistakes "were isolated incidents at the Plainfield branch or whether [Clements] had had similar experiences." DE 43-38, Sexton Dep., Page ID 628. During his deposition, Sexton was unable to recall whether or not Clements provided him with documentation of any errors Clements had noticed. Regardless, by

the end of December 2013 Sexton and Clements decided to put DeBra on a performance improvement plan ("PIP"). Both Sexton and Clements presented her with the PIP in January 2014; Clements allegedly delivered the plan while Sexton sat in the room. The PIP identified the following areas for improvement: "[o]ut of balance frequency which requires additional research by her and management"; "[l]eaving cash in the currency counters during the balancing process; "[p]aying clients more money than the transaction required resulting in potential loss"; "[n]ot following proper procedures during the course of reversing transactions"; and "[p]roper execution of dual control procedures." DE 43-9, Performance Improvement Plan, Page ID 448. The PIP expired on February 3, 2014; at that point, if DeBra had not reached the "expected level of performance," the PIP informed her that she could be subject to "corrective action, up to and including termination." *Id.*

DeBra testified that she was "surprised" to receive the PIP, even though she had been counseled by both Clements and Sexton regarding her December cash control errors. DE 43-37, DeBra Dep., Page ID 587. She also stated that she told Sexton she thought the PIP was unnecessary, since she had never before been formally disciplined during her time at Chase. According to DeBra, Sexton's response was "well, what if you ended up being terminated and I had never given you an improvement plan and then I could have never given you a . . . written notice." *Id.* Sexton denies making this statement.

During the PIP period (the month of January), DeBra made two errors: she left her coin vault unsecured at the end of her shift on January 14, and on January 16 she was $100 short, meaning that she had $100 less within her control than the teller express system indicated she should have had. According to the terms of the PIP, DeBra was to receive a "final review to assess the achievement of expected level of performance." DE 43-9, Performance Improvement Plan,

Page ID 448. The date for the final review was set as February 3, 2014. Sexton did not recall whether he conducted a final review and admitted that he did not tell DeBra that she was no longer on the PIP when the PIP period ended.

Once the PIP expired, DeBra continued to make cash handling and cash control errors. On February 14, 2014, while working at the drive-through, DeBra "shorted a client $20.00." DE 43-6, Sexton's Notes, Page ID 441. The client came back to get the $20 and "was visibly upset." *Id.* Apparently, DeBra had put the cash through the cash counter and a $20 bill had stuck in the counter, which DeBra did not notice. Sexton testified that unless a large amount of cash is involved, the cash counter "shouldn't be used for everyday random transactions." DE 43-38, Sexton Dep., Page ID 640.[2] Ten days later, on February 24, DeBra was given a Written Warning "due to unsatisfactory performance specifically around cash controls." DE 43-10, Written Warning, Page ID 451. The Written Warning listed the two errors DeBra made while on the PIP as well as the February 14 incident.

Sexton documented three additional errors in March 2014: (1) on March 7, DeBra did not properly track her hours during the week and failed to correctly complete her balancing procedures, (2) on March 17, DeBra was $20 short at the end of the day because she had dropped a $20 bill on the floor without realizing it was there, and (3) on March 28, DeBra did not return a debit card to client in the drive-through and the client had to return to the branch for the card. Finally, on April 1, 2014, Clements noted that DeBra "[d]id not involve LTOS [lead teller] or MOD [manager] before telling a customer that a check could not be cashed." DE 43-5, Clements's Notes, Page ID

---

[2] Clements did, however, acknowledge that the reason DeBra ran the cash through the counter was because "[s]he was trying to improve" and was attempting to be extra thorough by running it through the counter. DE 43-38, Sexton Dep., Page ID 640.

437. Clements testified that this failure was "not a policy violation," but "provides a poor customer experience." DE 43-36, Clements Dep., Page ID 552.

At some point in April, Sexton and Clements spoke to Nicolette Mendez, their district manager, about terminating DeBra. Sexton testified that he was the first to suggest she be terminated. Clements did not think DeBra's mistakes at his own branch were enough to justify termination, but he "agree[d] with the termination" in light of "the totality of the issues . . . at the Plainfield branch and the Ada branch." DE 43-36, Clements Dep., Page ID 535. Sexton, Clements, and Mendez then spoke to Human Resources; Sexton stated that he was the one who recommended termination, but that both Clements and Mendez "concurred." DE 43-38, Sexton Dep., Page ID 646. HR approved the decision to terminate DeBra. The recommendation for DeBra's termination, prepared on April 10, 2014, lists as the reason her "consistent unsatisfactory performance resulting in loss and negative customer impact." DE 43-11, Recommendation for Termination, Page ID 454. It also listed two more errors from April 2014, which were not documented in Clements's or Sexton's notes: (1) on April 2, DeBra ran a check for $2804 that should have been run for $2604, resulting in a $200 loss, and (2) on April 7, she "was completing a night drop for a client which included over $4,000.00 in cash" and, believing the bag was $1,000 short, "contacted the customer before speaking with her manager or having someone else count the bag and her drawer"; when her drawer was counted, she was $1,000 over, which explained the inconsistency. *Id.* DeBra disputes both of these errors.

DeBra was fired on April 14, 2014. She was 59 years old at the time of her termination.

B.

After unsuccessfully appealing her termination internally, DeBra filed a charge of discrimination with the Michigan Department of Civil Rights ("MDCR"). The MDCR

investigated her claim and recommended dismissal, concluding that DeBra "failed to show a causal connection between her age and the respondent's action" and had provided "insufficient evidence of unlawful discrimination." DE 40-17, MDCR Report, Page ID 257. On April 28, 2015, DeBra filed suit against Chase in Michigan state court, claiming that her termination violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et. seq.* Her complaint alleged that other, younger employees made mistakes similar to those for which DeBra was fired without facing the same disciplinary consequences. It further alleged that Chase replaced her with much younger tellers. Chase subsequently removed the lawsuit to federal court.

Chase moved for summary judgment, which the district court granted. Specifically, the district court found that DeBra had failed to show that she was treated less favorably than similarly situated employees, one of the essential elements of her prima facie case, because all of her comparators were managed by Clements, not Sexton—the person DeBra identified as being responsible for unfairly targeting her based on age. The court further concluded that even if DeBra had produced enough evidence for a prima facie case, she failed to rebut Chase's legitimate nondiscriminatory reason for the adverse action, *i.e.*, her repeated performance errors.

## II.

When reviewing a district court's decision to grant summary judgment, this court applies the *de novo* standard of review. *Simpson v. Ernst & Young*, 100 F.3d 436, 440 (6th Cir. 1996). Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there is a

genuine dispute of material fact, this court must view the facts "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

A.

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff bringing an ADEA claim "must prove that age was a determining factor in the adverse action that the employer took against him or her." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993) (citing *Kraus v. Sobel Corrugated Containers, Inc.*, 915 F.2d 227, 299–30 (6th Cir. 1990)). The Supreme Court has held that the ADEA does not permit "a mixed-motives" claim; instead, a plaintiff alleging a violation of § 623(a) must prove by a preponderance of the evidence that "age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175, 177 (2009).

B.

The plaintiff may prove but-for causation using either direct or circumstantial evidence. *Gross*, 557 U.S. at 177–78. DeBra only offers circumstantial evidence in support of her age discrimination claim. Circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (quoting *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc)). This court uses the *McDonnell Douglas* framework to analyze ADEA claims based on circumstantial evidence. *Id.* at 622; *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must produce enough evidence to establish a prima facie case of age

discrimination, namely: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Blizzard v. Marion Tech. College*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)).

Once a plaintiff sets forth a prima facie case of age discrimination, "the burden of production shifts to the defendant to articulate a non-discriminatory reason for its action." *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir. 2001). If a defendant articulates a legitimate non-discriminatory reason for its action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the defendant's stated reason was a pretext for age discrimination. *Id.* This Circuit recognizes three ways for a plaintiff to prove that the employer's stated reason is pretextual: (1) the reason has no basis in fact, (2) the reason did not actually motivate the discharge, or (3) the reason was insufficient to motivate the discharge. *See, e.g.*, *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (alteration in original) (internal quotation marks omitted)).

III.

The parties agree that DeBra has sufficiently established a prima facie case of age discrimination and that Chase has offered a legitimate, non-discriminatory reason for her termination. Thus, the issue in this case is whether a jury could reasonably infer that Chase's

legitimate, non-discriminatory reason—DeBra's performance errors—was a pretext for age discrimination.

DeBra's sole argument is that Chase's proffered reason "was insufficient to motivate the defendant's challenged conduct." *Lefevers*, 667 F.3d at 725 (quoting *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 268 (6th Cir. 2010)). Showing insufficient motivation "ordinarily[] consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds, *Geiger*, 579 F.3d at 621). DeBra has identified three arguably comparable employees outside the protected class; for anonymity's sake, we will refer to them as Teller 1, Teller 2, and Teller 3. We will briefly discuss each comparator in turn.

A.

Teller 1 was in her late twenties when DeBra was terminated. She was exclusively managed by Clements. Clements's testimony and notes indicate that Teller 1 made numerous errors of comparable magnitude as those made by DeBra, including failure to secure her coin vault, leaving out customer information at closing, and leaving her cashbox unsecured. Teller 1 also made two errors that seem more serious than any made by DeBra: on May 2, 2013, she left the bank branch unlocked overnight, and she received a referral credit for an account on which she was the secondary owner. She was placed on a formal written warning for leaving the branch unlocked.

Teller 2, who was also exclusively managed by Clements, was believed to be in her mid-twenties when DeBra was terminated. In 2014 and 2015, Clements documented numerous errors

made by Teller 2. Among other mistakes, she forgot her keys several times, left cash unsecured once, was twice short by almost $500 when balancing, issued a check from the wrong account, and failed to secure ATM cards and night deposit receipts when closing. The bank also received three complaints about her attitude, two from customers and one from an employee. In response to these performance issues, she was given formal coaching sessions.

Finally, Teller 3, who was in her mid to late forties when DeBra was terminated, transferred to the Ada branch in October 2014 and was managed exclusively by Clements until she was fired in the spring of 2015. Before her transfer to the Ada branch, Teller 3 had been placed on a PIP and received two written warnings. She received a Needs Improvement rating on her 2014 year-end performance review, but continued to have poor performance. Specifically, she made three errors which stand out as being more serious than those made by DeBra: (1) she failed to properly secure $20,000 in cash when walking away from the drive-through tube, (2) she incorrectly processed an $800 deposit for $80, creating a $720 possible loss, and (3) she incorrectly processed a $100,000 deposit for $10,000, creating a $90,000 possible loss. Clements submitted a recommendation for her termination on March 17, 2015.

B.

Tellers 1, 2, and 3 all made similar or more egregious mistakes than DeBra but each was treated with more leniency. Only Teller 3 was fired, but even she was given more chances to improve than DeBra received before her termination. DeBra was fired four months after being placed on a PIP, while Teller 3 was not fired until almost ten months after being placed on a PIP; in the meantime, she had received two written warnings and exposed the bank to a $90,000 loss, among other errors. This, then, would seem to provide DeBra with sufficient evidence of pretext to survive summary judgment, were it not for one crucial fact—all of DeBra's selected

comparators were managed exclusively by Clements, while DeBra was managed primarily by Sexton.

Similarly situated comparators must be "similar in all relevant respects." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012). At one time, we stated that having the same supervisor was a necessary prerequisite for selecting a similarly situated employee. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). However, we have since clarified that "[w]hether it is relevant in a particular case that employees dealt with the same supervisor depends on the facts presented." *Bobo*, 665 F.3d at 751 (citing *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005)). This is one such case where the difference in supervisors is highly relevant because here, the comparators and DeBra were subject to different "ultimate decision-makers." *Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 481 (6th Cir. 2008) (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762–63 (6th Cir. 2000)).

At the time of her termination, DeBra was spending twenty hours of her thirty-two-hour workweek at the Plainfield branch, managed by Sexton. Sexton was her "primary manager." DE 43-36, Clements Dep., Page ID 569. Unfortunately for DeBra, Sexton appears to have been a much stricter manager than Clements. Sexton initiated the disciplinary process when he contacted Clements to ask him whether he had noticed any performance issues from DeBra. Sexton was also the one to suggest that DeBra be terminated; in fact, Clements stated that he did not think her mistakes at his own branch were enough to justify termination, but he "agreed" with Sexton's recommendation based on "the totality of everything that happened." DE 43-36, Clements Dep., Page ID 535. This position appears to be in keeping with Clements's more yielding nature. Additionally, in conversation with Human Resources, Sexton recommended termination, while Clements merely "concurred" in Sexton's recommendation. DE 43-38, Sexton Dep., Page ID 646.

In fact, DeBra appears to cast the blame for her termination on Sexton, stating in her brief that "Mr. Sexton initiated the termination, as Mr. Clements had not seen enough in his branch to justify it." CA6 R. 22, Appellant Br., at 20. Thus, Sexton bore ultimate responsibility for DeBra's termination while Clements merely deferred to him as DeBra's primary manager.

Nor was DeBra singled out for scrutiny by Sexton. In his deposition, Sexton stated that he requested that two other bank employees be terminated in the two years after DeBra was fired. One, who was in her thirties, worked at the East Grand Rapids branch, and Sexton submitted a recommendation for termination based on "business account opening errors, just not following policies and procedures properly." DE 43-38, Sexton Dep., Page ID 631. He did not place that employee on a PIP before recommending that she be terminated.[3] The other employee, a teller in his early twenties, was terminated for twice leaving cash unsecured.

DeBra does not argue that Sexton treated younger employees better than she, nor is there any evidence in the record that he did so. In fact, both employees for whom he recommended termination after DeBra were significantly younger than she—one was in her thirties, and the other was in his early twenties. Furthermore, Sexton supervised one teller, Martha Maloney, who was three years *older* than DeBra. Sexton characterized Maloney as "an outstanding employee," and he never instituted any formal disciplinary actions against her. DE 40-21, Sexton Affidavit, Page ID 283. While employees with different disciplinary histories are not "similarly situated," *see Berry v. City of Pontiac*, 269 F. App'x 545, 549–50 (6th Cir. 2008), part of DeBra's theory of the case is that Sexton immediately began singling her out because of her age. She does not support

---

[3] In fact, Human Resources refused Sexton's request for termination because they "didn't feel the case was strong enough." This further shows that Sexton had exceedingly high standards for his employees, and sometimes considered seemingly minor errors as worthy of discipline.

this theory with any evidence, and in fact Sexton's assessment and treatment of Maloney suggest that such age-based animus did not exist.

Finally, DeBra concedes that she committed most of the errors that Sexton relied on to support her termination, although she attempts to minimize them by calling them "minor, non-egregious errors" and asserting that "she hadn't made mistakes that other tellers hadn't made." CA6 R. 22, Appellant Br., at 18. She does dispute the allegation that she did not track her time, and she also argues that she was not fully responsible for leaving her coin vault unlocked because Teller 1 was supposed to double-check DeBra's vault and failed to do so. Disputing two mistakes but conceding the rest is not the same as "contest[ing] the facts underlying the incident[s] that [led] to her termination, as the dissent argues. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 437 (6th Cir. 2009). DeBra does not argue that she made no mistakes or was a perfect employee; rather, she claims that her mistakes were treated differently than those of similarly situated employees. And as discussed, those employees were not, in fact, similarly situated, since they were all managed by Clements.

Because Sexton was DeBra's primary manager and the "ultimate decision-maker" behind her termination, *see McMillan*, 405 F.3d at 414, she must show that *Sexton* treated younger, similarly situated employees differently. To the contrary, the record reflects that Sexton was an extremely strict manager, who subsequently recommended for termination two employees who were younger than DeBra and arguably committed fewer and less egregious errors than she did. DeBra thus has failed to rebut Chase's legitimate non-discriminatory reason for her termination.

C.

DeBra also devotes a significant amount of time to arguing that the district court erred by determining that two statements allegedly made by Sexton were not "material." These are

Sexton's statements that (1) he did not want to get too close to an employee, because then it would be harder to fire that employee, and (2) he needed to create a paper trail in case he wanted to fire DeBra later so that he would not get into trouble. Sexton denies making either of these statements. DeBra argues that Sexton's denials are lies, and that this "lying about several factual questions could be interpreted by a jury as a cover up by him of his age bias." CA6 R. 22, Appellant Br., at 36.

Whether DeBra or Sexton—or perhaps neither or both—are lying about these statements is not an issue for this court to decide. On review of a grant of summary judgment, we must assume that DeBra's version of the facts is true and that Sexton made these statements, but we need not infer improper animus from his denials. Assuming the statements were said, moreover, does not make them material. The statements themselves do not indicate that Sexton possessed a discriminatory animus. Thus, the only way that such statements would be material and suggestive of a coverup is if DeBra had produced some other evidence that Sexton treated younger, similarly situated employees differently from DeBra. However, as we have discussed, DeBra has failed to produce any such evidence. The district court thus did not err in finding these statements to be immaterial.

IV.

DeBra also raised a claim under Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"). *See* Mich. Comp. Laws § 27.2101 *et seq.* Similar to the ADEA, the ELCRA prohibits an employer from "discharg[ing], or otherwise discriminat[ing] against an individual with respect to employment" because of (among other protected characteristics) that individual's age. Mich. Comp. Laws § 37.2202(a). ELCRA claims, however, do not require the plaintiff to prove but-for causation. Instead, a plaintiff suing under the ELCRA must "prove that the defendant's

discriminatory animus was a 'substantial' or 'motivating' factor in the decision." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011). Although ELCRA and the ADEA impose slightly different burdens of proof on plaintiffs, the same *McDonnell Douglas* burden-shifting rubric applies to both claims when they are premised on circumstantial evidence. *Id.* Since DeBra has failed to show that any similarly situated employees outside of the protected class were treated more favorably, her ELCRA claim must also fail. *See id.* at 819 (holding that plaintiff's failure to rebut employer's legitimate nondiscriminatory reason was "fatal to her ELCRA claim").

V.

DeBra has not produced any evidence that would allow a jury to conclude that Chase's proffered reason for her termination was a pretext for age discrimination. Therefore, she has not created a jury question as to whether age was the but-for or motivating cause of that termination. For the foregoing reasons, we affirm the judgment of the district court.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** To the majority, this case can be decided on one purported fact: DeBra was "managed primarily" by Sexton rather than Clements. Maj. Op. at 11–12. Because this point is neither as settled nor as determinative as the majority suggests, I respectfully dissent.

The majority is wrong to keep this case from a jury based only on Clements's slightly more subsidiary role in supervising DeBra. *See* Maj. Op. at 11 (agreeing that DeBra has otherwise presented "sufficient evidence of pretext to survive summary judgment"). As the majority notes, by the time DeBra was fired, she was "spending twenty hours of her thirty-two-hour workweek at the Plainfield branch, managed by Sexton." *Id.* at 12. But she was undeniably also managed during this time by Clements, and a reasonable jury could conclude that Clements participated in the bank's efforts to discipline and terminate DeBra. Indeed, the record shows that Clements approved of DeBra's performance-improvement plan, "coordinated on" the written warning that he and Sexton foisted on DeBra in March 2014, and agreed with the recommendation to terminate her employment. R. 43-36 (Clements Dep. at 34–35, 46, 48) (Page ID #535–36); R. 43-38 (Sexton Dep. at 68–69, 126–27, 134) (Page ID #628, 643, 645). In such circumstances, Clements was as much one of the "ultimate decision-maker[s]" as Sexton. *See McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005). I would therefore hold that DeBra has provided sufficient evidence of Clements's preferential treatment of similarly situated younger employees and of his role in her termination to survive summary judgment.

And even if I were to focus on Sexton, I would not treat Sexton's non-discriminatory treatment of another teller who is three years older than DeBra, Martha Maloney, as informative. DeBra's claim is that she was treated worse than younger employees who made similar mistakes. Maloney, whom Sexton describes as "an outstanding employee and high-performing teller," R.

40-21 (Sexton Aff. ¶ 8) (Page ID #283), is not a relevant comparator to DeBra, who indisputably made errors throughout the course of her career with Chase. *See Berry v. City of Pontiac*, 269 F. App'x 545, 549 (6th Cir. 2008) (holding that an employee is not a relevant comparator to the plaintiff when he had a significantly different disciplinary history). The majority acknowledges this fact but nevertheless suggests that "Sexton's assessment and treatment of Maloney" undercuts DeBra's theory that "Sexton immediately began singling [DeBra] out because of her age." Maj. Op. at 14. But the majority should not be testing the strength of DeBra's "theory of the case," *id.*, or weighing the evidence at the summary judgment stage. *Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 796 (6th Cir. 2013) ("When 'reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.'" (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009))).

What is more, DeBra's evidence of pretext is not limited to examples of differential treatment. She also disputes facts undergirding some of Chase's disciplinary decisions, such as the claim that she was responsible for tracking her time and failed to do so on March 7, 2014, R. 43-2 (DeBra Aff. at 3) (Page ID #404), and the claim that she was primarily responsible for leaving a coin vault unsecured on January 14, 2014, given that Teller 1 was supposed to check that DeBra's cash drawer and coin vault were secured but failed to do so properly, R. 43-37 (DeBra Dep. at 108–09) (Page ID #591–92). We have previously held that summary judgment in an age-discrimination case is inappropriate where the plaintiff "contests the facts underlying the incident[s] that led to [her] termination." *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 437 (6th Cir. 2009). That principle applies with equal force in this case.

Last, DeBra adequately calls into question the "credibility of [her] employer's explanation" for her various disciplinary actions and ultimate termination, which is another way for a plaintiff

to show pretext. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). For example, DeBra claims that Sexton made two comments to her that revealed an early interest in firing her. First, Sexton purportedly told her, in a manner that "appeared directed at [her]," that "he didn't want to get close to a person, because it would be more difficult to fire that person." R. 43-2 (DeBra Aff. at 2) (Page ID #403). Later, after placing DeBra on a PIP, Sexton allegedly explained that he needed to use such formal disciplinary action in case DeBra "end[s] up being terminated," R. 43-37 (DeBra Dep. at 91) (Page ID #587), suggesting that Sexton was using the PIP not as a means to help DeBra improve but instead as a means to set the stage for her termination. Sexton disputes making these statements, R. 43-38 (Sexton Dep. at 132–33) (Page ID #644), and the dispute is material to the case in light of other circumstantial evidence that DeBra offers of Sexton's and Clements's unlawful motives. DeBra claims, for instance, that she never received weekly sit-down meetings after being given a written warning, even though the written warning guaranteed that she would receive such support. R. 43-37 (DeBra Dep. at 180) (Page ID #609). She further claims that she was not confronted with all the incidents leading to her termination ahead of time, *id.* at 112 (Page ID #592), even though the recommendation for termination expressly states that all of the issues listed "have been documented and discussed with [DeBra]," R. 43-11 (Recommendation for Termination) (Page ID #454). And more minutely, DeBra disputes the way in which a number of the incidents were characterized in the formal write-ups. For example, DeBra contests Sexton's statements in his recommendation for termination that (1) DeBra's dropping and finding $20 on the floor on March 17, 2017 "delayed branch closing" and "impacted other employees and branch expenses," and (2) "[a] customer complained" after DeBra inadvertently retained the customer's debit card following a transaction on March 28,

2014.[1]  *Id.*; R. 43-37 (DeBra Dep. at 111–12) (Page ID #592).  Notably, Sexton's internal records of the March 17 and March 28 incidents do not include these details (i.e., the delayed branch closing, negative effects on employees and branch expenses, and a customer complaint).  *See* R. 43-6 (Sexton Notes at 3) (Page ID #441).

Taken all together, a jury could reasonably infer that Sexton targeted DeBra for termination, failed to provide adequate support and assistance to help DeBra avoid termination, and exaggerated the nature of the DeBra's errors when recommending termination in an effort to make her conduct seem more egregious to Chase's HR department.  Clements, meanwhile, agreed to go along with Sexton's efforts to terminate DeBra, even though Clements had treated younger tellers in the Ada branch with significantly more leniency.  Whether these facts, taken as a whole, indicate that DeBra was fired because of her age is for a jury to decide.

---

[1] Notably, this so-called mistake—finding $20 on the floor while attempting to balance at the end of day—amounts to behavior that Sexton testified tellers *should* do when they discover they are short while balancing.  R. 43-38 (Sexton Dep. at 92) (Page ID #634).